UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RALSTON WILLIAMS,<br>　　Petitioner,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br>　　Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 3:15-CV-01301 (VLB)<br><br>September 27, 2018 |

## MEMORANDUM OF DECISION DENYING GROUND 2 OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255 [DKT. 1]

On February 22, 2018, this Court ruled on all but one claim in Ralston Williams's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. [Dkt. 11]. The Court denied Mr. Williams's motion on each of those claims, Grounds 1, 3, and 4, including assertions that (1) his trial counsel was ineffective in failing to request that the jury determine the drug quantity beyond reasonable doubt, (2) the Court erred in determining the drug quantity at sentencing by using a preponderance of the evidence standard, and (3) his sentencing counsel was ineffective for failing to object to testimony from Ms. Jessica Burrows's family members. The Court withheld judgment on Ground 2, Mr. Williams's claim that defense counsel failed to properly advise him of his right to testify, and ordered an evidentiary hearing to develop the record on that limited issue.

Having heard testimony regarding Ground 2 at the August 2, 2018 evidentiary hearing and reviewed the subsequent briefing by the parties, the Court

1

now finds that Mr. Williams's has failed to show ineffective assistance of counsel and DENIES the final claim in his Motion.

## Background

On September 14, 2011, a grand jury charged Mr. Williams, with a three-count indictment of (1) conspiracy to distribute and to possess with intent to distribute heroin in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), (b)(1)(C); (2) possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and (3) possession with intent to distribute cocaine base / crack cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). *See United States v. Williams* ("*Williams*"), Case No. 11-cr-00172, [Dkt. 13 (Indictment)]. Co-defendants Jason Brodsky ("Brodsky"), Bruce Dais ("Dais"), and Alana Fiorentino ("Fiorentino") were charged only with the first count. *Id.* Mr. Williams entered a plea of not guilty on September 29, 2011. *See Williams*, [Dkt. 29 (Minute Entry)]. Unlike Mr. Williams, his co-defendants each entered into a plea agreement prior to trial. *See Williams*, [Dkt. 92 (Fiorentino Plea Agreement); Dkt. 138 (Brodsky Plea Agreement); Dkt. 145 (Dais Plea Agreement)].

Prior to trial, Mr. Williams filed a motion to suppress evidence resulting from a warrantless search of Mr. Dais's home, where Mr. Williams was located on September 7, 2011, and where the police came upon him clothed and sitting on a sofa napping in the middle of the day with bags of controlled substances on his lap and arrested him. *Williams*, [Dkt. 124 (Mot. Suppress)]. In particular, Mr. Williams sought to suppress evidence that heroin and crack cocaine had been on or near his person when police found him, claiming a violation of the Fourth Amendment protection against unreasonable search and seizure. The Government

challenged Mr. Williams standing, asserting that he was not an overnight guest at the residence with a reasonable expectation of privacy and that exigent circumstances warranted entry and search of the property. *Williams*, [Dkt. 150 (Opp'n Mot. Suppress)].

The Court held a hearing on the motion on May 2, 2012. *Williams*, [Dkt. 155 (Minute Entry of Suppression Hr'g)]. At the hearing, Mr. Williams testified in support of his argument that he was an overnight guest at Mr. Dais's home and had a legitimate expectation of privacy there. *Williams*, [Dkt. 302 (Suppression Hr'g Tr.)]. The Government had represented in its opposition to the motion that law enforcement officer's observed Mr. Dias conducting a hand to hand drug transaction in front of the residence, chased Mr. Dias in and through the residence in a hot pursuit entry and conducted a limited security sweep of the residence. [Dkt. 150 at 3-4]. The Government also elicited testimony from Mr. Williams that he did not know the name of the owner of the residence, only had a sweat suit to change into but no bag or suitcase, and was at a casino the night before his arrest and therefore was not an overnight guest. *Id.* at 14:13-16; 15:14-17:1; 31:7-19. After listening to the testimony, the Court denied the motion to suppress, finding that Mr. Williams was devoid of any credibility and concluding that he was not an overnight guest as claimed, but was a casual guest, and that the Government's search of the residence was justified by exigent circumstances. *Id.* at 39:9-40:10.

Trial commenced on May 18, 2012, and lasted four days. Co-defendants Fiorentino and Brodsky testified on behalf of the Government. *See Williams*, [Dkt. 220 (Trial Tr. 5/18/12 Vol. I) at 2; Dkt. 222 (Trial Tr. 5/24/12 Vol. II) at 10]. Mr. Williams

3

did not take the stand at trial. On May 29, 2012, the jury found Mr. Williams guilty on all three counts. *See Williams*, [Dkt. 174 (Jury Verdict)].

The Court held the sentencing hearing on May 14, 2013. At the hearing, Kim Burrows, the mother of Ms. Jessica Burrows, a young woman who had died from an overdose of heroine purchased from one of Mr. Williams's drug dealers, testified about her daughter's characteristics and the impact of her daughter's death on the family. *See Williams*, [Dkt. 315 (Sentencing Tr.) at 18:5-23:4]. Mr. Williams's friend, daughter, and sister then spoke on his behalf. *See id.* at 25:12- 28:19.

Mr. Williams also testified about the matters for which he took responsibility, his compassion for people addicted to drugs, including the decedent, his efforts to dissuade the decedent from using the drugs he continued to traffic, and that he was "not a big drug dealer." *See id.* at 29:1-33:10. After considering the testimony, the Court sentenced Mr. Williams to 168 months' imprisonment; three years' supervised release; a fine of $100,000 to be paid if he is deported and illegally reenters; and a $300 special assessment. *Id.* at 38:11-40:9.

Mr. Williams timely appealed the jury verdict and his sentence, specifically, the ruling on his motion to suppress the narcotics, the ruling regarding his role in the offense, and the ruling on the quantity of heroin. *See Williams*, [Dkt. 305 (Notice of Appeal)]. On June 20, 2014, the Second Circuit issued a summary order affirming both his conviction and sentence. *Williams*, [Dkt. 344]. Mr. Williams did not file a petition for writ of certiorari and his time to do so expired on September 18, 2014. *See* 28 U.S.C. § 2101(c) (requiring a writ of certiorari to be filed within 90 days after the entry of judgment).

Mr. Williams timely filed this habeas petition on August 31, 2015. *See* 28 U.S.C. § 2244(d)(1). On February 22, 2018, the Court denied all Grounds in Mr. Williams's § 2255 Motion except Ground 2—claiming his trial counsel was ineffective for failing to properly advise him of his right to testify and for overriding his desire to testify at trial. [Dkt. 11 (Feb. 22, 2018 Order)]. The Court ordered an evidentiary hearing to gather evidence as to whether trial counsel properly advised Mr. Williams of his right to testify. *Id*.

On August 2, 2018, the Court held the evidentiary hearing. Mr. Williams and his trial counsel, Attorney O'Reilly, testified at the hearing. *See* [Dkt. 29 (Hr'g Audio)]. Mr. Williams testified that, while Attorney O'Reilly told him that he had the right to testify at trial, Attorney O'Reilly consistently said that he would not let Mr. Williams get on the stand. *Id.* at 31-33. Mr. Williams testified that, as a result, he believed that it was ultimately his lawyer's decision whether he would testify, not his own. *Id.*

Attorney O'Reilly testified that, while he could not remember the exact conversions he had with Mr. Williams on the topic, it was his custom and practice to advise his clients that it was their right to testify at trial, and their decision whether to do so. *Id.* at 1:22-1:42. He testified that he advised Mr. Williams against taking the stand at his trial for a number of reasons, but did not remember any significant conflict between himself and Mr. Williams regarding the decision to testify. *Id.*

At the hearing, Mr. Williams's counsel argued that a failure to properly advise a client of his right to testify is a structural error, which requires automatic vacatur

of his conviction without further inquiry into the prejudice he may or may not have suffered. *Id.* at 1:47-49. Mr. Williams's counsel requested, and the Court allowed, the parties to brief this issue. *Id.*

## Legal Standard

Section 2255 enables a prisoner in federal custody to petition a federal court to vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(a). Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks and citation omitted). Section 2255 provides that a district court should grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

## Analysis

Mr. Williams claims that Attorney O'Reilly "rendered constitutionally ineffective assistance by overriding Petitioner's desire to exercise his constitutional right to testify at trial." [Dkt. 3 (Pet'r Mem.) at 5]. In his Memorandum in support of his § 2255 Motion, Mr. Williams claims that Attorney O'Reilly "never advised that the ultimate decision to testify remains at all times with" Mr. Williams, and when Mr. Williams told Attorney O'Reilly that he wanted to take the stand and tell his side of the story, Attorney O'Reilly advised him to speak during his sentencing instead. [Dkt. 3 at 5-6].

6

At the evidentiary hearing and in his supplemental brief, Mr. Williams further claims that Attorney O'Reilly told him it was his choice to testify, but that Attorney O'Reilly wasn't going to put Mr. Williams on the stand. [Dkt. 32 (Pet'r Suppl. Mem.) at 4]. From such comments, Mr. Williams says he understood it to be Attorney O'Reilly's decision whether he would ultimately take the stand at trial. [Dkt. 32 at 4-5]. As such, Mr. Williams claims that he was not properly advised as to his right to testify, which constitutes constitutional error and requires reversal of his conviction.

### A. The Legal Framework

A criminal defendant has a right to testify on his or her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 50 (1987). This right is rooted in the Fourteenth Amendment due process right, the Sixth Amendment Compulsory Process Clause, and the Fifth Amendment's guarantee against compelled testimony. *Id.* at 51-53.

The Second Circuit held in *Brown v. Artuz* that "the decision whether to testify belongs to the defendant and may not be made for him by defense counsel." 124 F.3d 73, 78 (2d Cir. 1997). It further held that defense counsel bears the burden of advising his or her client of their right to decide whether or not to testify. *Id.* at 79. The *Brown* Court explained that "[a]lthough counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on his matter." *Id.*

7

The Second Circuit found that, "[b]ecause the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel, [] this burden is a component of the effective assistance of counsel." *Id.* "As a result, any claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in *Strickland v. Washington* . . . for assessing whether counsel has rendered constitutionally ineffective assistance." *Id.*

To prevail on an ineffective assistance of counsel claim under *Strickland*, a movant "must establish both that counsel's performance was so defective that 'counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,' and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. 668, 466 (1984). To satisfy the performance prong, "the defendant must show that counsel's performance was 'outside the wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690). The prejudice prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694).

Despite this precedent, Mr. Williams argues that violation of a defendant's right to testify is a "structural error" which requires the automatic vacatur of conviction without an analysis of prejudice. [Dkt. 32 at 9-11]. Mr. Williams primarily relies on the Supreme Court's decisions in *Weaver v. Massachusetts*, 137 S. Ct.

1899 (2017) and *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), in making this argument.

In *Weaver v. Massachusetts*, the Supreme Court explained that it has deemed certain errors structural and required reversal "because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process." 137 S. Ct. 1899, 1911 (2017). The Court acknowledged that there is disagreement among circuit and district courts "about whether a defendant must demonstrate prejudice in a case like this one—in which a structural error is neither preserved nor raised on direct review but is raised later via a claim alleging ineffective assistance of counsel." *Id.* at 1907. The *Weaver* Court explained that the differences between direct and collateral review "justify a different standard for evaluating a structural error." *Id.* at 1912. Thus, even if an error is deemed structural requiring automatic reversal on direct review, the same may not be required on collateral review.

The Court went on to resolve the disagreement "specifically and only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection," *id.*, finding that, in such a case, "*Strickland* prejudice is not shown automatically." *Id.* at 1911. "Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.*

Mr. Williams argues that the right to testify is a structural error, and the violation of this right will always lead to fundamental unfairness such that reversal is required even on collateral review. [Dkt. 32 at 9-13]. He analogizes the right to testify with the right to decide whether to concede guilt, which the Supreme Court recognized in *McCoy v. Louisiana*.

In *McCoy*, the Supreme Court explained that the Sixth Amendment guarantee to the assistance of counsel in mounting a defense demands that the defendant have the right to decide whether to concede guilt. 138 S. Ct. at 1505. "With individual liberty . . . at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* More broadly, the Court recognized that "the right to defend is personal, and a defendant's choice in exercising that right must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* at 1507 (internal quotations and citations omitted).

The Court concluded that "[b]ecause a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, *Strickland v. Washington* . . . or *United States v. Cronic* . . ., to [the petitioner's] claim." *Id.* at 1511-12. In such cases, the violation of autonomy is "complete when the court allowed counsel to usurp control of an issue within [the petitioner's] sole prerogative" and, "when present, such an error is not subject to harmless-error review." *Id.* at 1511.

Mr. Williams argues that the right to testify similarly implicates a defendant's right to autonomy and to decide the way in which he will defend himself. And, like in *McCoy*, Mr. Williams suggests that violation of such a right so fundamentally impacts his defense that he is entitled to a new trial without any requirement of showing prejudice.

This Court agrees with Mr. Williams that a violation of a defendant's right to testify is likely a structural error based on the Supreme Court's guidance in *Weaver* and *McCoy*, as it implicates the client's autonomy and freedom "to make his own choices about the proper way to protect his own liberty." *McCoy*, 138 S. Ct. at 1511 (quoting *Weaver*, 137 S. Ct. at 1908). But, as Mr. Williams acknowledges, [Dkt. 32 at 8], neither the Supreme Court nor the Second Circuit have deemed a violation of a defendant's right to testify structural error,[1] nor have they determined whether automatic reversal is required on collateral review for such an error.

Rather, the applicable Second Circuit precedent, *Brown v. Artuz*, directs courts to consider such claims under the *Strickland* standard, including the prejudice prong. 124 F.3d 73 (1997). Multiple Second Circuit cases and district court cases following *Artuz* have applied the *Strickland* analysis to right to testify ineffective assistance of counsel claims on collateral review. *See, e.g., Bennett v.*

---

[1] Mr. Williams does cite *State v. Rivera*, in which the South Carolina Supreme Court found on direct review that a trial court's improper refusal to permit a defendant to testify in his own defense is error "not amendable to harmless-error analysis and requires reversal without a particularized prejudice inquiry." 741 S.E. 2d 694, 706 (S.C. 2013). However, the question at hand is not one of substantive state law, nor would South Carolina be the applicable state jurisdiction if it were. Second Circuit precedent, not South Carolina Supreme Court precedent, binds the decision of this Court.

*United States*, 663 F.3d 71 (2011); *United States v. Caracappa*, 614 F.3d 30 (2010); *Gomez v. United States*, 14-cv-5801, 2018 WL 2187822 (E.D.N.Y. May 11, 2018); *Zayac v. United States*, 3:16-cv-952, 2018 WL 310038 (D. Conn. Jan. 5, 2018). Of course, none of these decisions post-date the Supreme Court's very recent decisions in *Weaver* and *McCoy*.

Notwithstanding the possibility that a right to testify violation constitutes structural error demanding reversal on collateral appeal, for the reasons discussed below, Mr. Williams has failed to establish ineffective assistance of counsel resulting in a constitutional violation of his right to testify. As such, this Court need not foray into uncharted territories and decide the preceding issues.

### B. Mr. Williams's Constitutional Error Claim Fails

In *Brown v. Artuz*, the Second Circuit found the Eleventh Circuit's analysis in *United States v. Teague* instructive on the question of what satisfies the *Strickland* performance prong in the right to testify context. 124 F.3d at 80 (citing *United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992)). The *Teague* Court stated:

> [I]f defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify. Alternatively, if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary. Under such circumstances, defense counsel has not acted within the range of competence demanded of attorneys in criminal cases, and the defendant clearly has not received reasonably effective assistance of counsel.

953 F.2d at 1534 (internal quotations and citations omitted).

Mr. Williams has made claims and testified that Attorney O'Reilly failed to inform him that it was his own decision whether or not to testify, and further, that Attorney O'Reilly overrode Mr. Williams's desire to take the stand. Thus the issue before the Court turns on the credibility of Mr. Williams.

The Court finds Mr. Williams's testimony not to be credible based on all of the evidence in the record. This Court presided over Mr. Williams's suppression hearing in his criminal trial and sentencing in addition to this proceeding. As a result, this Court has heard testimony from Mr. Williams on multiple occasions. On each occasion, Mr. Williams provided this Court with reasons not to believe his testimony.

Mr. Williams first testified before this Court during the May 2, 2012 suppression hearing before his trial in support of his argument that he was an overnight guest at Mr. Dais's home such that he had a Fourth Amendment reasonable expectation of privacy in the home. *See Williams*, [Dkt. 302 (Suppression Hr'g Tr.)]. Mr. Williams testified that he was at Mr. Dais's home, a single bedroom in the condominium owned by Mr. Dais's mother, in the evening, and left around 10:00 p.m. to go to the casino. *Id.* at 14-17. Mr. Williams testified that he returned around 7:00 a.m. and went to the bedroom. *Id.* Mr. Williams further testified that he had stayed with Mr. Dais on numerous occasions however he did not know Mr. Dais's mother's name. *Id.*

Following his testimony the Court ruled: "While [Mr. Williams] claims to have been a periodic overnight visitor at the home, he admits that the home is owned by Mr. Dais' mother, and can't even remember her name. The room in which

he was found is the bedroom of Mr. Dais. The Court finds it incredulous to believe that Mr. Dais and Mr. Williams were cohabitating in that room, which was apparently also used by a child on occasion. . . [T]here is no indication that he was, in fact, as he claims, an "overnight visitor" residing for any significant period of time on those premises." *Id.* at 39-40.

The Court observed the same lack of credibility and candor at Mr. Williams's sentencing hearing. During the hearing, Mr. Williams testified that he had tried to get those working for him as drug dealers, as well as Ms. Burrows, to quit drugs and to enter drug treatment programs. *Id.* at 30:6-32:6. The Court expressed its incredulity at this testimony: "To think that you could use a drug addict to sell your drugs for you and at the same time believe that you were trying to help them to get off of drugs shows a lack of understanding and empathy that is inconceivable." *Id.* at 35:20-24. The Court further explained in an August 19, 2015 Order that Mr. Williams's lack of sincerity factored into the sentence he received. *Williams*, [Dkt. 388].

Mr. Williams also has an extensive criminal history, including convictions for illegal possession of a weapon in a motor vehicle, sexual assault, and resisting arrest. *Williams*, [Dkt. 241 (Pre-Sentence Report) at ¶¶ 32-38.] The last offense is further indication of the lengths to which Mr. Williams will go to evade responsibility for his criminal misconduct. On September 20, 2009, police "officer[s] were attempting to conduct a motor vehicle stop on the vehicle driven by the defendant (for running through a red light) when the defendant sped off and engaged police in pursuit. The defendant eventually lost control, and he and two

14

other passengers bailed out of the car and ran from the police. Police caught the defendant, who physically resisted them and refused to obey their commands. He kicked and punched as officers attempted to put him in handcuffs. Police struck him numerous times with their batons in order to gain compliance. In the right rear seat of the car police found a chrome-plated handgun (fully loaded with a round in the chamber), and two medium-sized bags containing crack cocaine." *Id.* at ¶ 36.

The Court does not find credible the claims made by Mr. Williams at the evidentiary hearing either. As an initial matter, Mr. Williams is not a novice in these matters. He is a veteran criminal defendant who has doubtlessly been advised of his constitutional rights many times. According to Mr. Williams, Attorney O'Reilly told him that it was Mr. Williams's "choice to testify but [Attorney O'Reilly is] not going to put [Mr. Williams] on that stand." [Dkt. 29 (Evidentiary Hr'g Audio) at 31:12-16]. Mr. Williams testified that he told Attorney O'Reilly, "I have to tell my side of the story on the stand. He said no." *Id.* 32:32-37. Mr. Williams further testified that Attorney O'Reilly told him there was "no way [he is] getting on that stand to make him look bad." *Id.* at 31:25-30. As a result of such comments, Mr. Williams testified, "I figured he's my lawyer so more than likely he knows what's best. . . I figured your lawyer calls the shots." *Id.* at 31:47-57.

The fact that Mr. Williams testified at the suppression and sentencing hearings suggests that he did understand that it was his right and his decision whether to testify in his own defense. Mr. Williams recognized that Attorney O'Reilly strongly advised against Mr. Williams testifying at the suppression hearing. *See* [Dkt. 29 at 34:23-34]. Attorney O'Reilly even said on the record at the

15

suppression hearing that he didn't want Mr. Williams to testify. *Williams*, [Dkt. 302 at 11:17-18]. But it was Mr. Williams desire to testify so he took the stand anyway.

At his sentencing hearing, Mr. Williams took the stand and said, "I'm going to say some things that I've been advised by my lawyer before not to say, but I feel it's only right that I say it." *Williams*, [Dkt. 315 at 29:1-5]. Mr. Williams went on to state during his sentencing hearing that he wanted to take the stand at trial "but I was advised again, not to say anything." *Id.* at 30:14-16. At his sentencing, Mr. Williams commented multiple times about the fact that he had not testified at trial, and each time, he said he had not testified based on *advice* from counsel. At no time did Mr. Williams say that his counsel did not allow him to testify, or that counsel forced him not to take the stand. The Court finds it unlikely that Mr. Williams would not have characterized it that way had that actually been the case.

Mr. Williams's testimony directly conflicts with Attorney O'Reilly's credible testimony. Attorney O'Reilly testified at the evidentiary hearing that it is his regular practice to tell his clients that they have a right to testify at trial and it is their decision whether or not to take the stand. [Dkt. 29 at 1:22-24; 1:27-30; 1:39-40]. While Attorney O'Reilly testified understandably to not having a specific recollection years earlier of that conversation with Mr. Williams, he did recall talking to Mr. Williams about whether Mr. Williams should take the stand and strongly advising him not to. *See Id.* at 1:23:24-47; 1:30:08-15. Attorney O'Reilly further testified that he recalled telling Mr. Williams the many drawbacks to him testifying and the ways in which it would be problematic, but Attorney O'Reilly has no recollection of a significant conflict over the decision. *Id.* at 1:39-40.

All of this testimony rings true to the Court. That Attorney O'Reilly's memory isn't perfect after six years is not unexpected, nor does it require this Court to believe Mr. Williams's claimed memory of their conversations. *See Bennett*, 663 F. 3d at 86 (characterizing counsel's lack of memory after ten years as "hardly surprising," acknowledging counsel's testimony as to their regular practice of informing clients of their absolute right to decide whether to testify, and finding that "[t]he district court . . . was entitled to find that the testimony of [counsel] was to be credited and that the testimony of [the petitioner] was not.").

Attorney O'Reilly has represented hundreds of criminal defendants in state and federal court, including more than 300 in this district where he serves on the CJA Panel. He has come before this Court in particular on many occasions and has always appeared to be honest and empathetic towards his clients. In every instance, Attorney O'Reilly zealously represented his clients in the manner they chose. For example, Attorney O'Reilly took a different case to trial before this Court at his client's insistence despite the fact that the evidence left no room for doubt and Attorney O'Reilly had counseled against proceeding. *See USA v. Harvey, et al.*, Case No. 3:11-cr-00133 (VLB).

Based on the foregoing, this Court finds Attorney O'Reilly and his testimony in this matter credible. The Court finds Mr. Williams's testimony incredible. The Court believes that Attorney O'Reilly properly advised Mr. Williams of his right to decide to testify at trial, as evidenced by the fact that Mr. Williams took the stand at the suppression hearing and Mr. Williams's own testimony at his sentencing hearing. Further, the Court finds that Mr. Williams did not testify based on advice

from Attorney O'Reilly, not because Attorney O'Reilly prevented him from doing so. As a result, this Court finds that Mr. Williams failed to show constitutionally deficient performance by his counsel. *See Bennett*, 663 F.3d at 86 (upholding the trial court's finding of no deficient performance by counsel in light of the court's findings that the petitioner's blanket statements that counsel had improperly advised him of his right to testify and overrode his decision to testify were incredible and the attorneys' testimony that it was their practice to always inform clients of their right to testify and to decide whether to testify was credible); *Reynolds v. U.S.*, 233 F. App'x 904, 905 (11th Cir. 2007) (finding that the district court did not err in finding the petitioner failed to show constitutionally deficient performance by counsel based on credible testimony from counsel of "general practice" of appraising defendants of their right to testify); *McGriff v. Dep't of Corr.*, 338 F.3d 1231, 1237-38 (11th Cir. 2003) (holding that when counsel states it was her "ordinary practice" to advise clients of the right to testify, the court does not clearly err in finding it more likely than not that counsel had advised the defendant); *U.S. v. Campbell*, 300 F.3d 2020, 214-15 (2d Cir. 2002) (upholding the trial court's holding of no ineffective assistance of counsel based on findings that counsel's testimony that he told the petitioner that he could testify at trial if he wished was credible and petitioner's testimony otherwise was incredible).

Mr. Williams has failed to show constitutionally deficient assistance of counsel, and the Court need not address the prejudice question. *See Bennett*, 663 F.3d at 84 ("The IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong."); *Chang v. United States*, 250 F. 3d 79,

84 (2d Cir. 2001) (given that Chang did "not establish[] a deficiency in representation," "we . . . need not address the prejudice issue"). As such, Mr. Williams's Ground 2 claim is DENIED.

## Conclusion

For the foregoing reasons, Ground 2 of Petitioner's § 2255 Motion is DENIED. The Clerk is directed to close this case.

      IT IS SO ORDERED

      _____/s/_____

      **Hon. Vanessa L. Bryant**
      **United States District Judge**

Dated at Hartford, Connecticut: September 27, 2018